## KING *vs.* HARRIS.

A party whose judgment has been illegally vacated will not be deprived of his lien, if he ultimately reverses the order which set aside his judgment; unless the equities of bona fide purchasers or incumbrancers intervene.

Thus, where a judgment which was the first lien upon mortgaged premises after the mortgage, was vacated and set aside on the ground of irregularity, by an order which was subsequently reversed on appeal; *Held,* that the lien of such judgment was not lost, by the vacatur; but that the judgment was entitled to be first satisfied out of the surplus moneys arising from a sale of the premises, under the mortgage, in preference to junior judgments.

APPEAL from an order made at a special term confirming the report of a referee as to the priorities of the several liens upon surplus moneys. The fund in the court was the surplus proceeds of the foreclosure sale in this cause, after satisfying the claims of the mortgagees. The claimants of this fund were: 1. Theodore C. Foote and Daniel D. Foote, who obtained a judgment in this court against Dennis Harris, owner of the mortgaged premises, which was filed and docketed January 1, 1856, for $4607.90, and who regularly filed a claim to the surplus in this cause. 2. Bartolome Blanco, who recovered a judgment in this court against Harris, which was filed and docketed April 3, 1856, for $72,685.66. An attachment was issued in this action, and levied on the mortgaged premises, January 7, 1856. 3. Jose T. Alfonso and others, who recovered a judgment in this court against Harris, which was filed and docketed January 30,

1856, for $13,610.65. Execution was issued on the Foote judgment, and subsequently, on February 29, 1856, an order was made at a special term, setting aside the judgment and execution *for irregularity,* and vacating the judgment on the docket. A memorandum of this order was entered on the docket. On appeal, this order of the special term was *vacated and set aside* by an order made at general term, May 8, 1856. This order was delivered to the clerk May 12. A memorandum of this order was entered on the docket, October 21, 1856. Upon motion at general term, on the part of Harris, an order was made November 23, 1857, (by default,) by which the order of May 8, 1856, was opened, and the appeal from the order of February 29, 1856, ordered to stand for argument. On November 30, 1857, the order of November 23 was *"vacated and wholly set aside;"* and the motion to set aside the order of May 8, 1856, was denied. The sale of the mortgaged premises took place February 5, 1857; and the proceeds in the chamberlain's hands amounted to $2446.25. Mr. Cambreling, who was appointed referee to ascertain the priorities of the liens, reported that the Foote judgment became a lien on the mortgaged premises January 1, 1856, and so continued till February 29, 1856, when the judgment and docket thereof were vacated; and that said lien was not revived till October 21, 1856, when the docket of the judgment was restored; that Blanco's judgment, docketed April 3, 1856, related back to the levy of the attachment, January 7, 1856, and became a lien from that day; and that Blanco was entitled to the fund in court, as having the first lien. Upon exceptions to this report, on the part of the Footes and of Alfonso and others, the report was confirmed at a special term, and T. C. and D. D. Foote, and Alfonso and others, appealed.

*Wm. M. Evarts,* for the appellants T. C. and D. D. Foote.

*R. S. Emmet,* for Alfonso and others.

*John Anthon,* for Blanco.

King *v.* Harris.

*By the Court,* MULLIN, J. On or about the 12th June, 1856, an action of foreclosure was commenced by the plaintiffs, as mortgagees, against Harris, the mortgagor, and others, to foreclose a mortgage. In or about October, 1856, judgment was entered in that suit, and the premises were sold about the 5th February, 1857. There was a surplus, arising from the sale, of $2646.25. On the 1st of January, 1856, a judgment was docketed in this court in favor of Theodore C. Foote and D. D. Foote, against Harris, the defendant in this suit, for $3456.37, and on that day it became a lien on the mortgaged premises. On the 29th February, 1856, this judgment was set aside for irregularity, and an entry of its vacatur made on the docket, by order of the court. On the 8th May, 1856, an order was made by the general term, to which an appeal had been taken from the above order of the special term, vacating that order, by default.

On the 23d November, 1857, an order was made, I conclude by default, vacating the order of the general term of the 8th May, 1856. And on the 30th of November, 1857, the last mentioned order of the 23d of the same month was vacated, and a motion to set aside the order of the general term of the 8th May, 1856, was denied. The owners of this judgment apply for the surplus moneys, on the ground that their judgment is the first lien thereon.

On the 2d of January, 1856, Bartoleme Blanco commenced an action in this court, by attachment, against the defendant Harris, which attachment was delivered to the sheriff on that day. Judgment in that action was docketed against the defendant on the 3d of April, 1856, for $12,685.66. The owners of this judgment claim the surplus, on the ground that theirs is the oldest lien on the premises, subsequent to the mortgage; the lien attaching from the delivery to the sheriff.

On the 4th December, 1855, Jose S. Alfonso and others commenced an action in this court against the defendant Harris and others, and on the 30th of January, 1856, judgment was duly docketed in said action, in favor of the plaintiffs,

for $13,610.65.    The owners of this judgment also claim the surplus.

If the judgment in favor of Foote can maintain its priority, it is entitled to the whole fund, and it will be unnecessary to inquire into the priority of the other two judgments.

It is insisted, that the judgment of Foote lost its priority by reason of the order of the special term of February, 1856, vacating and setting aside that judgment and the entry of it on the docket; and that the reversal of that order by the general term did not revive the lien which was destroyed by the entry on the docket; and that in order to revive it, as of the date of the original docketing, it was necessary that the court should order it docketed *nunc pro tunc;* and as no such order has ever been made, the lien did not attach again until the entry on the docket in October, 1856, of the fact of reversal of the order of the special by the general term in May, 1856. If these positions are correct, then the Foote judgment has no claim to the surplus.

It is argued by the counsel of the owners of the other two judgments that the vacatur of the judgment of Foote, and the entry on the docket, terminated the lien; and that although the reversal of the order might revive the judgment, it did not get rid of the entry on the docket; and as the judgment is not a lien until docketed, the judgment when revived was not redocketed; and hence no lien was obtained, by reason of the revivor.

It seems to me that this reasoning is fallacious.    The entry on the docket of the judgment was not destroyed or defaced by the order of the special term.    The entry, in pursuance of the order, had the effect to terminate the lien; or rather, it informed all concerned that it was no longer a lien.    So in regard to the judgment.    The record remained on file, and the orders remained on the books of the clerk, as if no order had been made; but the judgment was, in contemplation of law, destroyed.    When the order of the general term was entered, it had the same effect upon that branch of the order of the

King *v.* Harris.

special term relating to the docket that it had on that part relating to the judgment. If reversing that part relating to the judgment revived the judgment, as of the day when it was vacated, then surely the lien was revived from the same time when the entry cancelling the docket was swept away.

I do not mean to say that either the judgment, or its lien, is revived for all purposes, and against all parties. Such, I apprehend, is not the law. After the entry of the order of the special term, all persons dealing with the real estate of the judgment debtor as bona fide purchasers and incumbrancers, and all commencing actions affecting the real estate, would be at liberty to act as if no such judgment had ever been docketed; and the subsequent reversal of the order could not affect such parties or their proceedings. Such parties have a clear, equitable and legal claim to protection against any inquiry arising from the reversal of the order, after their rights have attached. But there is no such equity in favor of judgment creditors, who became such by adverse proceedings, or by confession; unless it may be when the confession is given to secure advances, or under such circumstances as constitute the plaintiff a bona fide incumbrancer for value. The bona fide purchasers and incumbrancers deal with property with notice, and on the faith of the order vacating the judgment; in other words, they deal with the debtor's property as if the judgment had never been a lien on it. They pay or advance money upon the property freed from the lien of such judgment. Having thus acted, it would be a fraud upon them to revive the lien, and give it a preference over their lien or title. But the judgment debtor who obtains his judgment by action, has not been influenced in his action by the order vacating the judgment. He has parted with nothing on the faith of such order, and he is not made a loser by its reversal and the revival of the lien. I do not mean that he is not by the reversal made worse than he was while the order of the special term was in force, but I mean no worse than he was when he recovered his own judgment. His judgment was then previous

to Foote's, and is placed by the reversal in the same relative position.

The learned counsel for the junior judgment creditors seem to place great stress on the fact that no entry of the reversal was made on the docket until October, 1856, and that the original entry made pursuant to the order of the special term was permitted to stand until that time. According to my understanding of the law, these parties had no interest in the docket, beyond the fact of the entry or non-entry of the Foote judgment therein. If it was docketed then, it became a lien; if it was not, then it was no lien. What happened to the judgment, or its docket, after that, would affect the parties according to their equitable rights as between each other, and as between them and the judgment debtor. In other words, the lien of the judgment would be recognized or disregarded, as the equities of the case might require. The docket of a judgment performs a double office: it creates a lien, and gives notice to parties dealing with the judgment debtor and his property, of the charges upon him and it. Bona fide purchasers and incumbrancers, only, can complain of the want of notice. The judgment creditor proceeding adversely has no equities arising from the want of notice. Let us suppose that Blanco's judgment became on the day it was docketed a lien on 100 acres of land, of which Harris had the title; and that before the recovery of the judgment, an action had been brought to compel Harris to reconvey to his grantor 50 of the 100 acres, on the ground of fraud in acquiring the title, judgment is recovered declaring the purchase by Harris fraudulent, and directing an entry on the record of the deed to that effect. This judgment is afterwards, in all things, reversed. Now can it be contended that it would require any entry on the record of the deed, in order to subject the 50 acres to the lien of Blanco's judgment? I apprehend not. Yet all persons dealing with the land after the entry, are charged with notice of the judgment and its effect on the title. And until something is done to take away the effect of this notice, bona fide

King *v.* Harris.

purchasers and incumbrancers have the right to treat the lands as not charged with the lien of the judgment. But could the judgment creditors of Harris claim any equities, because no entry of the reversal was made on the record? I apprehend not. Yet the equity to do so is just as strong as it is to acquire a preference over Foote's judgment, because there was no entry of reversal on the docket. But it is unnecessary to discuss the question further. It seems impossible that a party whose judgment has been illegally vacated should be deprived of his lien, if he ultimately reverses the order which set aside his judgment; unless the equities of bona fide purchasers or incumbrancers intervene.

Had a formal record been made, upon the reversal of the judgment, it would have directed " that the plaintiff be restored to all things which he had lost thereby," i. e. the judgment recovered. To give full effect to this direction the lien must be restored, when it can be done without prejudice to those parties. And it has never been supposed that a judgment creditor by adverse proceedings was a party having an equity to protect, in such cases. The judgment of Foote must be held to have the prior lien upon the surplus; and as it is large enough to swallow up the whole, that judgment is entitled to the whole surplus. The order of the special term is therefore reversed.

[NEW YORK GENERAL TERM, December 22, 1859. *Roosevelt, Sutherland* and *Mullin*, Justices.]