# N. Y. SUPERIOR COURT.

In the Matter of the Application of August J. Christern, Heinrich Weinberger, and Arnold Geisemann, to perfect the record of proceedings admitting them to citizenship of the United States.

*Naturalization — Admission of alien to citizenship — Jurisdiction— Duty of clerk of court as to record of judgment, admitting to citizenship.*

The superior court of the city of New York has power and jurisdiction to entertain and grant an application, to have a record of the proceedings in such court, admitting the applicants to citizenship of the United States, perfected by an entry *nunc pro tunc* of the fact of such admission in the minute book of the court, provided a proper case has been made out for its exercise.

As a general rule the court will not permit a party to suffer through any delay or mistake of its own, nor by the delay or mistake of its officers.

It is only when the rights of third persons which have in the meantime been acquired in good faith intervene, that relief will not be given; but even such third persons cannot rely upon a mere technical error which leaves no doubt about what was intended.

In the admission of aliens to citizenship, the only record required to be kept by the court, where the application is made, and the certificate of citizenship issued, is a record showing the declaration of intention, the oath to support the Constitution of the United States, and the renunciation of the foreign jurisdiction and title or order of nobility.

No provision is made as to how the judge presiding over the court should proceed to satisfy himself of the fulfillment of the conditions prescribed, and no provision is made for the preservation of the oral proofs to be given or the attestation of the adjudication to be made, or for the entry of the fact of such adjudication in any book. In the absence of statutory regulations upon the subject, the extent and manner of keeping the record of court proceedings, is left very much to the sound discretion of the court.

Where it is shown by the applicant, that on full preliminary requirements of the statutes of the United States, he duly applied in open court to be

admitted a citizen of the United States; that he took the requisite oaths, and and supported his application by the necessary and to the court satifactory proof; that the court gave judgment to admit to citizenship, and that the officiating judge signified his "fiat" to that effect to the clerk of the court, to the applicant and to all whom it might concern, by superscribing the initials of his name upon the written and oath attested proofs in the case, and delivered the same to the clerk to do thereupon and therewith all that the law required; that the clerk then and there, in pursuance of such judgment and fiat duly administered, and the applicant duly took and subscribed, the oath commonly called the oath of allegiance ; and that thereupon the clerk issued to the applicant, under the seal of the court, a certificate as evidence of the fact of the adjudication made; that the clerk then indorsed and filed the papers and fiat among the court records, as a part thereof, and entered the name of the applicant and other facts connected with the application in a book of index of naturalization records, which is one of several books of like character, regularly kept and permanently preserved among the records of said clerk's office:

*Held*, that, the clerk, in the performance of the duties assigned to him in these proceedings, was guilty of no omission, which rendered the record, as made up by him, invalid.

When the presiding judge, on giving judgment admitting the applicant to citizenship, attested the fact thereof by affixing his initials to the preliminary proofs, and delivered the papers so attested to the clerk with the direction, express or implied, to do all that remained to be done, the judicial function was completed, and only ministerial acts remained to be done; and the papers so handed over, together with the oath of allegiance thereupon administered, became the judgment record of the court on being filed as such by the clerk and by reason of such filing. The record thus made up constituted a sufficient memorial or remembrance within the requirements of the common law.

If it be deemed of importance that an entry should be made in some book, the entries contained in the books marked "Naturalization Index" and "Naturalization Record" fully answer every requirement that can be made in that respect.

*Special Term, October*, 1878.

*Algernon S. Sullivan*, Esq., appeared and argued in support of the motions.

FREEDMAN, J. — The object of these applications is to have the record of the proceedings in this court, admitting the

Matter of Christern.

applicants to citizenship of the United States, perfected by an entry *nunc pro tunc*, of the fact of such admission in the minute book of the court. Each of the applicants applies separately in his own behalf, and shows under oath, among other things, the following facts: That on full preliminary requirements with the statutes of the United States, he duly applied in open court to be admitted a citizen of the United States; that he took the requisite oaths and supported his application by the necessary and to the court satisfactory proof; that the court gave judgment to admit to citizenship, and that the officiating judge signified his " fiat " to that effect to the clerk of the court, to the applicant and to all whom it might concern, by superscribing the initials of his name upon the written and oath-attested proofs in the case, and delivered the same to the clerk to do thereupon and therewith all that the law required; that the clerk then and there, in pursuance of such judgment and fiat duly administered, and the applicant duly took and subscribed, the oath commonly called the oath of allegiance; and that thereupon the clerk issued to the applicant, under the seal of the court, a certificate as evidence of the fact of the adjudication made; that the clerk then indorsed and filed the papers and fiat among the court records, as a part thereof, and entered the name of the applicant and other facts connected with the application in a book of index of naturalization records, which is one of several books of like character, regularly kept and permanently preserved, among the records of said clerk's office; that the applicant has always believed, and been advised, that the proceedings and judgment above recited duly admitted him to citizenship of the United States, but that recently the supervisor in chief of elections in this district, claiming to act under the acts of congress relative to the supervision of elections (*R. S. of the U. S.*, secs. 2002 – 2031), and the punishment of crimes against the naturalization laws (*secs.* 5424–5429), has denied the validity of such admission and threatened to subject the applicant to criminal prosecution if he should attempt to vote at

the next election, and that the only ground of such denial and threat is that there is no legal record of the judgment admitting to citizenship, for the reason that the clerk did not write out an entry in the minute book of the court reciting the proceeding and showing the adjudication made. The facts so far referred to are common to the three applications. They differ only in the following particulars : August J. Christern was admitted on the 15th of September, 1868, at a term of this court held by judge JONES, and Heinrich Weinberger on the 9th of October, 1868, at a term held by judge GARVIN. Their respective applications were made and granted in accordance with section 21 of an act passed at the second session of the thirty-seventh congress, entitled "an act to define the pay and emoluments for certain officers of the army and for other purposes." Arnold Geisemann was also admitted during the October term of 1868, but his application was founded upon his prior declaration of intention to become a citizen, which he had made and filed in this court on the 6th day of June, 1853. As an additional fact Heinrich Weinberger shows that the said supervisor of elections retains in his possession the certificate of citizenship issued to Weinberger by this court.

The questions arising upon the motions before me are of such great importance that I should have been glad to hear the district attorney of the United States for the southern district of New York or the supervisor-in-chief in opposition. I am assured that they were both courteously requested to appear and present their views, but that they declined on the ground that they could not do so consistently with their obligations. I exceedingly regret that they arrived at this conclusion, because in the decision of the questions involved no conflict can arise between state and federal jurisdiction. True, in providing for a uniform rule of naturalization pursuant to the Constitution of the United States, congress adopted, among others, the courts of record of the several states having common law jurisdiction and a seal and clerk, as agents to exercise the power to admit aliens to citizenship. But in exercising this

power the said courts act exclusively under the laws of the United States, and hence are to be deemed *quoad hoc* courts of the United States. The concurrence of the legislatures of the states, expressed or fairly implied, merely adds the sanction of the state to this delegation of power (*Ramsden's Case*, 13 *How. Pr. R.*, 429; *The People* agt. *Sweetman*, 3 *Park. Cr. R.*, 358). In the absence, therefore, of the benefit which I might have derived from an argument in opposition, I felt it to be my duty to thoroughly examine for myself the grounds of the several motions and all questions arising thereon. In this I have been greatly assisted by the timely suggestions and extensive researches of the learned counsel who appeared in support of the motions.

The prayer of the motions being, in substance, that a certain defect which is assumed to exist be cured by amendment of the record *nunc pro tunc*, the first question that presents itself relates to the power of the court to entertain the application.

Section 5328 of the Revised Statutes of the United States expressly provides that nothing contained in the title, of which sections 5424–5429, relating to the punishment of crimes against the naturalization laws, form a part, shall be held to take away or impair the jurisdiction of the courts of the several states under the laws thereof. Under the statutes of the state of New York this court possesses ample power to entertain a similar motion in any action or proceeding which arose under the laws of the state. But as in matters of naturalization the court acts exclusively under the laws of the United States, it may be doubted whether powers conferred by the statute law of the state can be invoked. On the other hand, no restriction upon the power to amend can be found in any act of congress. From this it follows that the power exists, if it exists at common law, and that it may be exercised by every court which is at liberty to exercise it under the common law. This court belongs to that class of courts, and the existence at common law of the power to amend has been distinctly affirmed in

*Weed* agt. *Saratoga and Schenectady Railroad Company* (19 *Wend.*, 534) and *Leetch* agt. *Atlantic Mutual Insurance Company* (4 *Daly*, 518). In those cases it was held that every court of record has power to allow amendments on equitable grounds in every species of action independently of the terms of statutes. In general any court of record, unless restricted by statute, may grant an amendment of any proceeding within its jurisdiction. This is a power inherent in the court, and its existence is just as necessary for the purpose of administering justice as the power of the court to vacate its process, order or judgment to prevent an abuse thereof. Moreover, the Revised Statutes of the United States expressly provide:

Section 954. "No summons, writ, declaration, return, process, judgment or other proceedings in civil causes in any court of the United States shall be abated, arrested, quashed or reversed for any defect or want of form, but such court shall proceed and give judgment according as the right of the cause and matter in law shall appear to it, without regarding any such defect or want of form, except those which in cases of demurrer, the party demurring specially sets down together with his demurrer as the cause thereof, and such court shall amend every such defect and want of form other than those which the party demurring so expresses, and may at any time permit either of the parties to amend any defect in the process or pleadings, upon such conditions as it shall in its discretion and by its rules prescribe."

This grant of power, given in a plenary form, is but declaratory of the principles as they exist at common law. I therefore have no doubt of the existence of the power and jurisdiction to entertain the application and to grant it, provided a proper case has been made out for its exercise. As a general rule the court will not permit a party to suffer through any delay or mistake of its own (*Clapp* agt. *Graves*, 2 *Hilt.*, 317), nor by the delay or mistakes of its officers (*Chichester* agt. *Cande*, 3 *Cow.*, 39 ; *Neele* agt. *Berryhill*, 4 *How.*, 16 ; *King* agt. *Harris*, 34 *N. Y.* [7 *Tiff.*], 330 ; *S. C.*, 30 *Barb.*,

471; *Mechanics' Bank* agt. *Minthorne*, 19 *Johns.*, 244). It is only when the rights of third persons, which have in the meantime been acquired in good faith, intervene that relief will not be given; but even such third persons cannot rely upon a mere technical error which leaves no doubt about what was intended (*Close* agt. *Gillespy*, 3 *Johns.*, 526).

The question, therefore, remains whether the clerk did omit to do any thing in the premises that the law required him to do, and, if so, whether such omission is of sufficient importance to call for a perfection of the record.

The determination of this question involves the construction of the act of congress in regard to the naturalization of aliens, in force at the time of the admission of the present applicants, and a review of the course and practice of this court in acting under the same. The act of 1802 prescribed as conditions of naturalization that the applicant should have declared, two years at least before his admission, his intention to become a citizen of the United States (*sec.* 1, *subd.* 1), and that at the time of his application he should swear to support the Constitution of the United States and renounce and abjure all allegiance and fidelity to every foreign prince, potentate, state or sovereignty, &c., &c. (*sec* 1, *subd.* 2), and that such proceedings should be recorded by the clerk (*Sec.* 1, *subd.* 2). In case the applicant bore any hereditary title or was of any of the orders of nobility in the kingdom or state from which he came, he was, in addition, required to make an express renunciation of such title or order of nobility, and this renunciation had to be recorded in the said court (*Sec.* 1, *subd.* 4). It was also provided that the court admitting such alien should be satisfied that he resided within the United States five years at least, &c., &c., and that during that time he behaved as a man of good moral character, &c., &c. (*Sec.* 1, *subd.* 3). The second section of the same act which prescribed a form for the registry of aliens desirous of becoming citizens of the United States had been repealed by the act of May 24, 1828. The third section prescribed that every court of record in any

individual state having common-law jurisdiction and a seal and clerk or prothonotary should be considered as a district court within the meaning of said act, and every alien who might have been naturalized in any such court should enjoy the same rights and privileges as if he had been naturalized in a district or circuit court of the United States. By the act of July 17, 1862, it was further provided that any alien of the age of twenty-one years and upward showing an honorable discharge from the army of the United States, a residence of one year within the United States previous to his application, and a good moral character, should be admitted upon proof of these facts and without any previous declaration of his intention to become a citizen.

These are all the provisions in force, in the year 1868, which it will be necessary to consider. They have since that time been incorporated, without material change, into the Revised Statutes of the United States. From them it will be seen that the only record required to be kept is a record showing the declaration of intention, the oath to support the Constitution of the United States and the renunciation of the foreign jurisdiction and title or order of nobility. No provision existed then or exists now, except as above stated, as to how the judge presiding over the court should proceed to satisfy himself of the fulfillment of the conditions prescribed, and no provision was made for the preservation of the oral proofs to be given or the attestation of the adjudication to be made, or for the entry of the fact of such adjudication in any book. Of course courts do, and necessarily must, keep some record of their proceedings. But in the absence of statutory regulations upon the subject the extent and manner of keeping it is left very much to their sound discretion.

What, then, constitutes a record? "A record," says Coke upon Littleton (260, *a*), "is a memorial or remembrance in rolls of parchment of the proceedings and acts of a court of justice which hath power to hold plea, according to the course of the common law, of real or mixed actions, &c., &c.   *   *   *

During the term wherein any judicial act is done the record remaineth in the breast of the judges of the court and in their remembrance, and therefore the roll is alterable during that term as the judge shall direct," &c., &c.

In the course of time rolls of parchment fell into disuse and the usage sprang up of keeping a memorial or remembrance of the proceedings in a book which was finally designated as the "minute book." But this book is a thing of very modern date. In it the clerk keeps a brief account of the proceedings of the court, but such account is never verified or attested by the signature of the judge. It is not, however, the only form of preserving a memorial or remembrance of the proceedings and acts of a court, nor is it the most satisfactory or trustworthy, because it rests entirely upon the intelligence and fidelity of the subordinate clerk who happens to have the charge of it. An order bearing the signature or the initials of the presiding judge must necessarily be at all times more satisfactory and trustworthy. It was therefore held in *The Mayor, &c., of Ludlow and Charlton* (9 *C. & P.*, 242) that a document delivered out by the registrar of the court of chancery as the order of the court is the original order, and that to make it evidence it was not necessary that it should be compared with any book of the orders of the clerk. From all this it follows that the form of the judgment record showing the admission of an alien to citizenship, so far as no express provision for it is made by act of congress, is utterly immaterial. As long as it constitutes a memorial or remembrance of the adjudication made it is sufficient. Thus, in *Spratt* agt. *Spratt* (4 *Peters* [*United States Reports*], 406), chief justice MARSHALL held: "The various acts upon the subject submit the decision on the right of aliens to admission as citizens to courts of record. They are to receive testimony, to compare it with the law and to judge on both law and fact. This judgment is entered on record as the judgment of the court. 'It seems to us, if it be in legal form, to close all inquiry, and like every other judgment to be complete evi-

dence of its own validity. The inconvenience which might arise from this principle has been pressed upon the court, but the inconvenience might be still greater if the opposite opinion be established." In *McCarthy* agt. *Marsh* (5 *New York*, 263) this decision was held by the court of appeals to be a binding authority upon all the state courts, and hence that court, against the able argument of Charles O'Conor to the contrary, came to the conclusion that the entry in the minutes of the court reciting the compliance of the applicant with the requirements of the law and showing his admission contained every thing necessary to constitute the entire record of his admission as a citizen; that it was unnecessary for the plaintiff to give evidence in support of the fact recited, and incompetent for the defendant to contradict it, unless by matter of record importing equal verity; and that without such contradiction the record was conclusive. In coming to this conclusion the prior case of *Ritchie* agt. *Putnam* (13 *Wend.*, 534) was approvingly referred to by RUGGLES, chief justice, in which the supreme court, on the authority of 7 Cranch, 420, had held that it need not appear by the record that all the preliminary requisites to a naturalization had been complied with, but that the judgment of the court admitting the alien to become a citizen is conclusive evidence upon that point. And in coming to the same conclusion FOOT, J., expressed the following views, viz. :

All courts look with favor on proceedings to admit aliens to citizenship, and it is just that they should, for the want of acquaintance with our laws and judicial proceedings, the unsettledness of their residences in general for some years and the consequent liability to lose their documents and papers, should shield them from technical and sharp objections to their naturalization papers whenever there appears to have been an honest intention to become a citizen and comply with the laws of our country.

Of course in deciding simply in favor of the sufficiency of

an entry in the minutes the court of appeals did not decide that the record could not be made in some other way.

It will now be proper to observe the course and practice followed by the superior court of the city of New York in matters of naturalization. Prior to 1858 the preliminary proofs and the oath of allegiance of the applicants were in many, if not in most, cases written out by the clerk and kept upon loose sheets of paper. The declarations of intention, however, were, since November, 1846, kept in a separate book. These loose papers were filed away, after the action of the court upon them, as of the date of the respective applications and kept in the office of the clerk in the same manner as other records were preserved. In passing upon each application the judge holding the court neither signed the papers, nor did he affix his initials, but the clerk was required to note the fact of the judgment of admission by an entry in the minutes. Up to 1858 these entries were made in the minutes; but in that year, no doubt in consequence of the large increase in the number of applications, the practice was changed. Printed blanks came into general use for making the preliminary proofs and taking the oath of allegiance. If the applicant and his witness, after having been duly sworn to make true answers, answered all questions put to them to the satisfaction of the court, the presiding judge, on admitting the applicant to citizenship, signified the fact of having made such adjudication by affixing the initials of his name to the application, and thereupon handed the papers to the clerk, with directions to do whatever might remain to be done; the clerk then, in pursuance of such adjudication, fiat and directions, administered, and the applicant in open court took, the oath of allegiance, and a certificate was given to the applicant as evidence of the fact of his admission. The papers containing the fiat of the presiding judge, as aforesaid, were thereupon indorsed and filed among the records of the court as a part thereof, and marked filed as of the date of the respective application. An entry was also made in a book, kept in

alphabetical order, showing the date of the admission, the name of the applicant, his nationality, the name of his witness and the residence of such witness, and if the admission was ordered without a previous declaration of intention, either on a discharge from the army or on the ground that the applicant had arrived in this country during his minority, such fact was specially alluded to. As often as necessary a new book of like character was opened upon the same plan. All the books thus kept were permanently preserved among the records of the court. The first thus opened and kept bears upon the outside the simple title or label "Naturalization." The one next in order of time is labeled "Naturalization Index." Those opened since October 16, 1868, bear the title "Naturalization Record." The practice, however, of making an entry in the regular minute book was discontinued. The course and practice as now detailed was observed by the court for the following fifteen years, and under it the promovents now before the court were admitted in 1868.

Now the files and records of this court distinctly show that the said applicants duly complied with all the requirements of the law to be performed on their part, and that all the allegations contained in the affidavits now submitted by them as to the manner in which the court acted upon and granted their respective applications and in which the clerk perfected the record of the proceedings are true. There is, in addition to the differences already noticed, only the further difference between them, that the entry of the fact of the admission of A. J. Christern and of Heinrich Weinberger is contained in the book labeled "Naturalization Index," and that the entry of the fact of the admission of Arnold Geisemann is contained in the book marked "Naturalization Record." But the difference in the designations of these books is of no importance, because regard must be had to their contents rather than their outside appearance.

In whatever aspect the case may be considered it clearly and distinctly appears that the clerk, in the performance of

the duties assigned to him in these proceedings, was guilty of no omission which rendered the record, as made up by him, invalid. When the presiding judge, on giving judgment in each case admitting the applicant to citizenship, attested the fact thereof by affixing his initials to the preliminary proofs, and delivered the papers so attested to the clerk with the direction, express or implied, to do all that remained to be done, the judicial function was completed, and only ministerial acts remained to be done; and the papers. so handed over, together with the oath of allegiance thereupon administered, became the judgment record of the court on being filed as such by the clerk and by reason of such filing. The record thus made up constituted a sufficient memorial or remembrance within the requirements of the common law. Thus, in *Parsons* agt. *Willoughby de Broke* (13 *W. R.*, 315), it was held by COCKBURN, C. J., and CROMPTON, BLACKBURN and MELLOR, JJ., that a document becomes a record of the court by being delivered to the proper officer of the court, and received and filed by him as such, although it is not numbered or docketed.

If, on the other hand, it be deemed of importance that an entry should be made in some book, the entries contained in the books marked "Naturalization Index" and "Naturalization Record" fully answer every requirement that can be made in that respect. These books are in the nature of special minute books. They contain the record of special proceedings entertained by the court not in the exercise of its. ordinary or general jurisdiction as a court of the state of New York, but in the exercise of a jurisdiction specially delegated to it by act of congress ; and the entries, as they appear therein, present in themselves a better and more detailed record, and at the same time one which is better adapted for purposes of ready reference, than the ordinary entry of the fact of admission would present or be, if inserted in the general minute book of the court. There is no law or rule which forbids this court to keep as many minute books as it may deem expedient.

In any aspect of the case, therefore, the claim advanced by the chief supervisor of elections for the southern district of New York, to the effect that the judgments of this court admitting the promovents to citizenship respectively are a nullity for want of an entry in the general minute book, and that consequently the said parties are not citizens of the United States, is utterly untenable. It rests upon a mere technicality which no court can listen to with patience. His proceedings against the promovents are wholly unjustifiable, for the statutes of the United States, under which he proposes to act, confer no such authority upon him.

Section 5424 of the Revised Statutes provides for the punishment of every applicant or witness who in any proceeding under the naturalization acts personates any other person than himself, or appears in an assumed or fictitious name or disposes of or uses any false paper. Section 5425 makes it unlawful for any person (1) to use or attempt to use any certificate of citizenship knowing the same to have been unlawfully obtained; or (2) to knowingly possess a false or forged certificate of citizenship with intent unlawfuly to use the same; or (3) to accept or receive any certificate of citizenship with knowledge that it was fraudulently procured.

Section 5426 makes it unlawful for any person (1) to in any manner use, as evidence of a right to vote, any certificate of citizenship knowing the same to have been unlawfully issued; or (2) to unlawfully use or attempt to use a certificate or order issued in the name of any other person.

Section 5427 applies to persons aiding or abetting.

Section 5428 makes it unlawful for any person (1) to knowingly use any certificate of naturalization procured through fraud or by false evidence, or issued by the clerk or any other officer of the court without any appearance and hearing of the applicant in court and without lawful authority; or (2) to falsely represent himself to be a citizen of the United States, without having been duly admitted to citizenship, for any fraudulent purpose whatever.

Section 5429 provides that the provisions of the five preceding sections shall apply to all proceedings had or taken, or attempted to be had or taken, before any court in which any proceeding for naturalization may be commenced or attempted to be commenced.

These provisions originally constituted the act of July 14, 1870, entitled, " An act to amend the naturalization laws and to punish crimes against the same, and for other purposes." Prior to 1870 false swearing by either applicant or witness in a state court could only be punished, as decided in *The People* v. *Sweetman* (3 *Park. Or.* 358), by the courts of the United States ; and whether an indictment would lie in any such case depended upon the statute of the United States relating to perjury.

Fraud, other than perjury, could not, prior to 1870, be punished criminally at all unless the particular offense could be brought within the thirteenth section of the act of March 3, 1813, entitled "An act for the regulation of seamen on board the public and private vessels of the United States." That section made it a felony to falsely make, forge or counterfeit, or cause or procure to be falsely made, forged or counterfeited, any certificate or evidence of citizenship referred to in the act, or to pass, utter or use as true any false, forged or counterfeited certificate of citizenship, or to make sale or dispose of any certificate of citizenship to any person other than the person for whom it was originally issued and to whom it may of right belong.

These provisions having been found inadequate congress passed the act of July 14, 1870.

The provisions of this act apply only to offenses committed subsequent to the passage of the act. But in order to provide, as near as possible, a remedy against false and fraudulent certificates of citizenship previously obtained and yet avoid the objection which might be raised to an *ex post facto* law, the use of such certificates, and. even their possession with intent to use them, was prohibited as therein provided. The cer-

tificates, the use or possession of which is thus prohibited, may be divided into four classes, viz.: 1. Certificates which are forged or counterfeit and, hence, are not at all the act of the court whose seal they profess to bear. 2. Certificates which, though genuine in all respects and issued pursuant to the direction of the court, were procured by or for the applicants named therein by means of some imposition or fraud practiced upon the court. 3. Certificates issued by the clerk or other officer of the court without lawful authority in cases in which there was no appearance and hearing of the applicant in court; and 4. Certificates issued to a person other than the one who uses or attempts to use it. But the prohibition does not apply to a case in which there was an honest compliance on the part of the applicant with the requirements of the law, and the court, in the exercise of its jurisdiction, made or gave the proper order of judgment, but of which the clerk neglected to make an entry, though he filed it and although he issued the certificate. In such a case the certificate is valid and conclusive. Much less does it apply to a case like the cases at bar in which every thing was done which the law and the practice of the court required to be done.

If the chief supervisor of elections were possessed of evidence showing that the promovents procured their admission to citizenship by means of a fraud or imposition practiced upon the court, and would lay such evidence before this court, I should not hesitate for a moment to vacate the judgments. In all such cases this court will most cheerfully co-operate to punish the guilty parties. Moreover, if such proof exists in any case the guilty party should be indicted and tried in the federal courts, and the offense committed should not be condoned upon a surrender of the false or fraudulent certificate to the chief supervisor of elections which would leave the record of admission unimpeached, and under the decisions above referred to conclusive, and the offender at liberty to procure a duplicate certificate.

But to cast discredit upon the records of this court gener-

ally without possessing any such proof, and that by resorting to the merest technicality in cases in which it is conceded that the applicants duly and honestly complied with all the requirements of the law, is a proceeding which deserves the severest condemnation. From 1858 to 1873 about 40,000 aliens, including over 1,000 women, were naturalized by this court in precisely the same manner as the promovents were naturalized. If the records of this court were a nullity as to the latter they would be a nullity as to every one of the 40,000 persons admitted during that period.

True, in 1873, in addition to all that was done during the preceding fifteen years, the practice of making brief entries in the regular minute book was resumed and it has been continued ever since. But this was done because the attention of the court had been drawn, by its present efficient clerk, to the very technicality now insisted upon and in order to obviate all possible objection on this ground in the future though possessed of no merit or force. At any rate this step, taken by way of abundant precaution, cannot detract, as I have already sufficiently demonstrated, from the validity of the prior records.

Certainty, in respect to citizenship, is of inestimable importance. What sovereignty has a right to command his person, his time, his property, and to establish the conditions of his domestic relations and the rule of succession for him and those dear to him is a vital question for every man. What civil and political rights he possesses, and to what sovereignty he must look for protection, depends upon his status as a citizen. If these 40,000 persons did not legally become citizens of the United States, and by virtue thereof citizens of their respective states, the title to real estate of the value of many millions of dollars may hereafter be drawn in question. On the other hand certainty of citizenship is of equal importance to the government. If these 40,000 persons did not legally become citizens none of them can be held subject to military or jury duty by the federal or any state government.

Even, therefore, if a defect in the record existed in conse quence of the omission of some ministerial act by the clerk, the United States government, in the absence of a law declaring such defect final, could not afford to insist upon it. The United States are so largely indebted to immigration for their power, greatness and prosperity that it would be an act of folly to return to the illiberal policy of George III, who, in consequence thereof, stands charged in the declaration of independence with having endeavored to prevent the population of the states by obstructing the laws for the naturalization of foreigners and by refusing to pass others to encourage their immigration hither.

I think I have now conclusively established that there is no defect whatever in the record of the admission of the pro_ movents, and that even if absence of an entry in the general minute book could be deemed a defect it is one which is immaterial and whose disregard is demanded by every consideration of public policy. Indeed, it is one of the fundamental principles of the law that every court is the guardian of its own records and master of its own practice. (*Broom's Leg. Max.*, 127).

There being no defect in the record which requires perfection by amendment the motions must be denied on the ground that no necessity exists for granting them. Heinrich Weinberger, however, may have a duplicate certificate of citizenship in case the chief supervisor of elections shall persist in detaining the original.